IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

* * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | 18-CR-229-1 |
| Plaintiff | : | |
| | : | James A. Byrne Courthouse |
| v. | : | Philadelphia, Pennsylvania |
| | : | |
| | : | May 20, 2021 |
| | : | |
| RYAN ANDREW DAVIS | : | |
| | : | EXCERPT OF |
| Defendant | : | SENTENCING HEARING |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE GERALD J. PAPPERT
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:   MICHELLE ROTELLA, ESQUIRE
                      UNITED STATES ATTORNEY'S OFFICE
                      615 Chestnut Street, Suite 1250
                      Philadelphia, Pennsylvania  19106

For the Defendant:    JOHN H. PAVLOFF, ESQUIRE
                      SCHINDLER LAW GROUP, LLC
                      810 East Baltimore Pike
                      Kenneth Square, Pennsylvania  19348

                      STEPHEN P. PATRIZIO, ESQUIRE
                      DRANOFF & PATRIZIO, P.C.
                      2 Penn Center 1205
                      John F. Kennedy Boulevard
                      Philadelphia, Pennsylvania  19102

Deputy Clerk/
ESR Operator:         Jeffrey Lucini

                          - - -

TRANSCRIBED BY:       Drummond Transcription Service
                      Haddon Heights, New Jersey  08035

    Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription
service.

1          (Proceedings in progress in open court at 3:42:31 p.m.

2  in the James A. Byrne United States Courthouse, Courtroom 11A.)

3          THE COURT:  All right, Mr. --

4          MR. PATRIZIO:  Judge, if I could just --

5          THE COURT:  -- Patrizio, I -- I know, we -- we have a

6  lot of input here from the witness, but now I would like to give

7  you an opportunity to make some remarks on -- on behalf of --

8          MR. PATRIZIO:  Thank you.

9          THE COURT:  -- your client and after which if your

10  client wishes, I would like to hear from him --

11          MR. PATRIZIO:  Yes, sir.

12          THE COURT:  -- as well.

13          MR. PATRIZIO:  Judge, if -- if I could just

14  acknowledge the people --

15          THE COURT:  Of course.

16          MR. PATRIZIO:  -- that are here today, that have not

17  testified, other than Mr. Justino?

18          Bill Davis, Ryan's grandfather, could you just stand

19  up, sir?

20          THE COURT:  They don't have to stand up --

21          MR. PATRIZIO:  All right.

22          THE COURT:  -- there is not that many --

23          MR. PATRIZIO:  All right.

24          THE COURT:  -- I can see them all.

25          MR. PATRIZIO:  And Gale Davis, Ryan's grandmother,

1    that's on the paternal side, yes?

2              THE DEFENDANT:  Hm-hmm.

3              MR. PATRIZIO:  And Ryan's mom Robin Herd.

4              THE COURT:  Ma'am.

5              MR. PATRIZIO:  And Ryan's grandmother on the maternal

6    side, Maryanne and Kathy Tevelson and she is Paul Justino's

7    aunt.

8              THE COURT:  Yes.

9              MR. PATRIZIO:  And Carol Justino, Paul Justino's mom.

10             THE COURT:  Yes.

11             MR. PATRIZIO:  And Mr. Justino, the -- I'd just ask --

12             THE COURT:  And thank you all, again, everyone who is

13   here did write a letter and I appreciate receiving it, I've read

14   them all very carefully, thank you for taking the time to write

15   to me.

16             MR. PATRIZIO:  Okay.

17             THE COURT:  Come on up, Mr. Patrizio.

18             MR. PATRIZIO:  Thanks, Judge.

19             THE COURT:  Yes.

20             MR. PATRIZIO:  Judge, I am very mindful of the hour

21   and I am mindful of your giving us the opportunity to present

22   what we've presented here today.  And -- and, Judge, I believe

23   that you've read all of -- not just the letters and the

24   accomplishments of Mr. Davis while he was incarcerated and I --

25   and --

4

1          THE COURT:  I have read them.

2          MR. PATRIZIO:  -- and --

3          THE COURT:  Thank you, yes.

4          MR. PATRIZIO:  -- to me, they are significant for --

5    for the purposes that have already been discussed by our

6    experts, but also I think they straight up demonstrate the

7    maturity and growth and acknowledgment of the defendant in terms

8    of a viewpoint toward remorsefulness, accepting responsibility

9    and going forward for the period of time that he has been

10   incarcerated and into the future.  So, I would ask the Court to,

11   again, consider that as I know that you have done in reading

12   those.

13          My sentencing memorandum, Judge, highlights many of

14   the things that I would like to say to you, but I am not going

15   to, because I believe and I know that you have read them.

16          I guess, the main point that I would like to ask the

17   Court to consider is, knowing full well that you affirmed the

18   enhancements, but I extensively wrote about other courts' real

19   need for the overhauling and the not lockstep considerations of

20   all the provisions that put these sentences of child pornography

21   in --

22          THE COURT:  On the high side.

23          MR. PATRIZIO:  -- in the stratosphere of where I find

24   these.

25          And -- and I don't think, it's just idle chatter, it's

1    a whole lot of people from a whole lot of disciplines from

2    judges to congressmen to -- to -- but I know you're going to

3    consider that or I'd ask you to consider that in -- in varying

4    this sentence.

5            One of the last things I -- I'd want to say to you,

6    Judge is -- is that -- ah -- our adversary here Ms. Rotella,

7    chief of the unit that she -- she comes here with is without a

8    doubt an excellent adversary and a hard charger.

9            But in every case, she takes the position and her

10   allocution in -- in the documents, I feel just asking for the

11   top end of the guidelines with no deviation at all, it's just

12   not appropriate in this case.

13           And I -- I'd ask the Court to look at this defendant

14   as he stands here today at the age of twenty-four, I think

15   that's a significant factor in meting out a sentence.

16           I'd ask the Court to consider Mr. Justino, who has

17   stuck by him for this period of time and comes here today to

18   tell you that he is willing to stick by him upon his release.

19   And I think that's a positive, again, that doesn't call for a

20   guidelines sentence, but a variance.

21           To -- to incarcerate this man in any part of the

22   guideline range, I don't believe it is close to being necessary

23   for punishment, to send messages to other folks and, again,

24   that's in the literature.

25           And I'd ask the Court to consider the letter that my

1   client has written, which hopefully, he is going to stand before

2   you and say similar things, but I felt that his letter is the

3   lynchpin of who he is, what he is going forward.

4        The last point I want to make, Judge is, is that this

5   business about Max, my client is going to talk to you about that

6   a little bit.

7        I feel that this was a child-pornography case and I

8   feel very much that the Government has taken all the time to

9   talk about his prior contact offense and -- and I think that

10  that needs to be understood and separated for all of the reasons

11  that our experts have opined about and --

12       THE COURT:  Well, I mean, there's -- look, I'd want to

13  put you at ease, I'm not sentencing Mr. Davis for the state

14  charges involving the abuse of his cousins, that's been resolved

15  in the state system --

16       MR. PATRIZIO:  And Judge, I --

17       THE COURT:  -- we're sentencing here for the -- the

18  violations of federal laws.

19       There have been extensive discussions about that prior

20  conduct for reasons that are, of course, appropriate to this

21  proceeding, such as the enhancement that we've discussed.

22       MR. PATRIZIO:  Yes.

23       THE COURT:  But more importantly, that conduct is very

24  relevant -- it was very relevant -- for both of your experts and

25  for Dr. Rodriguez to help the Court understand, among other

1    things, the chances for rehabilitation, the risk of recidivism

2    and the like.  So, obviously, I will talk about the prior

3    offenses but it is all going to be in the context of informing

4    the sentence for the federal offenses.

5         I don't want you to worry that -- no one is in here

6    sentencing him, because anybody might think he got a light

7    sentence before, that matter is done.

8         MR. PATRIZIO:  And I -- and I appreciate that, Judge.

9         It's just that when you read the Government's memo,

10   eleven of the pages of their memorandum are all about the

11   chapter and verse of what he reported and what he said, all

12   about that event and his deceitfulness and not forthcoming and

13   things.  And I'd just ask you to parse that for the

14   considerations that I know, you will give it, but I just don't

15   want you to be inflamed by the -- the rhetoric that was supplied

16   in the Government's memorandum.

17        Lastly, Judge, Ms. Rotella points to a -- a number of

18   cases about sentencing within the guidelines.  And, again, I

19   know that you are going to look at this individually and this

20   case alone, but she referenced one case, that I think, she tried

21   to compare it.  And it was a case of yours called, Olimpi and

22   because -- because in that case, her argument is, a first-time

23   offender, guidelines.

24        And every one of these cases are driven by those facts

25   and -- and I -- I know that you probably remember this, but that

1   was a production case.  And there -- in my opinion when you look

2   at the facts -- there was no comparison between this young man's

3   behavior and the guidelines sentence that you imposed in Olimpi,

4   in that case, that was a manufacturing case that was very, very

5   different in terms of scope and the actual facts.

6          Similarly, she -- she mentioned the Philip Ahr case

7   and she brought it up here in -- in this case.  She referenced

8   that case as being a within-the-guidelines sentence and it

9   wasn't.  Judge Baylson's sentence, a variance, it was 151 months

10  but the guidelines were over 200.

11         So, I -- I don't think that you are going to take the

12  bait, so to speak, that you're going to sentence him on this

13  case and not what another case or what a judge does.  And I also

14  believe and I have confidence in this Court that it is going to

15  mete out a sentence for Mr. Davis for that conduct and for the

16  facts.

17         And I implore the Court, that this young man, twenty-

18  four years of age to sentence him to a within the guideline or

19  the top end of the guideline, I -- I'd just ask the Court to not

20  do that.  I'd ask for a sentence of five years and my questions

21  were geared toward that, because five years is a very long time.

22         Five years and I believe and my client will -- may --

23  he may tell you -- but he's asked me to tell you to sentence him

24  or make a recommendation to Devens, because he's --

25         THE COURT:  He's been incarcerated for over -- for

1    three years, already --

2              MR. PATRIZIO:  Yes.

3              THE COURT:  -- a five-year sentence would mean,

4    assuming good behavior, that he'd be released in a year and

5    three-quarters, roughly, a year --

6              MR. PATRIZIO:  Not necessarily, Judge, because --

7              THE COURT:  Is there any -- did you hear any expert

8    testimony here today from either side, that your client would be

9    in a position to give anybody any confidence that he has been

10   rehabilitated and that any shred of recidivism has been, maybe,

11   not eliminated but severely mitigated, I didn't hear any of

12   that.  I don't think anything that your experts said would

13   support a sentence anywhere near five years.

14             Why -- why -- am I -- and if I'm wrong, tell me why?

15             MR. PATRIZIO:  Well, I -- I'm not necessarily saying,

16   you're wrong but my understanding is, is that nobody wants to go

17   to Devens in these programs, because --

18             THE COURT:  I am not talking about Devens --

19             MR. PATRIZIO:  -- but --

20             THE COURT:  -- I am talking about five years and the

21   fact that, we took several hours here today to hear from two

22   retained experts on behalf of the defense.

23             And I'm asking you to tell -- to point to something

24   that they said, where your own experts would support a five-year

25   sentence on the basis that they would think that at the

1    conclusion of another year and two-thirds, roughly --

2              MR. PATRIZIO:  No, no one -- no one has said that,

3    Judge --

4              THE COURT:  Thank you.

5              MR. PATRIZIO:  -- no one has said that.

6              But -- but my only point is, is that what we know or

7    what my client knows is, is that if he is sentenced there, he's

8    got to complete those programs and as Dr. Rodriguez said, okay,

9    it depends upon the work that he puts in.

10             And what I am simply saying to the Court is, is that

11   this young man is dedicated to treatment, he is dedicated to

12   rehabilitation by wanting to go to a place that no sex offenders

13   want to go to voluntarily, okay.  He's ready to do the heavy

14   lifting and to do the work that he now knows, he needs to do,

15   that he did not do in Delaware County.

16             THE COURT:  Hmm.

17             MR. PATRIZIO:  And -- and that -- that is my point,

18   Judge and --

19             THE COURT:  Okay.

20             MR. PATRIZIO:  -- and the same way that I'm saying,

21   five years, if you sentenced him to five years, he wouldn't be

22   out in two years, because that program is real work and real --

23   and real difficult.  And there are three phases of it and it --

24   it takes longer than a year or two, it takes years to do that

25   program, Judge.

1          THE COURT: I -- I don't understand your point --

2          MR. PATRIZIO:  My -- my --

3          THE COURT:  -- you want a five-year sentence and yet,

4  you seem to be telling me, that even if I sentenced him to five

5  years, the BOP wouldn't release him unless they completed -- he

6  completed this program?

7          MR. PATRIZIO:  That's correct, because --

8          THE COURT:  That's correct?

9          MR. PATRIZIO:  -- he would not, necessarily, get --

10          THE COURT:  He would be re -- he would be retained in

11  federal prison beyond the date that I sentenced him to, who

12  would have the authority to do that?

13          MR. PATRIZIO:  Well, I think, that's where this civil

14  commitment kicks in in terms of treatment, that's at least, my

15  understanding.

16          THE COURT:  Okay.

17          MR. PATRIZIO:  Judge, thank you for the -- for all the

18  time and --

19          THE COURT:  Thank you, Mr. Patrizio.

20          MR. PATRIZIO:  -- the patience.

21          And, again, I'd rely upon -- I know that you have read

22  my submissions --

23          THE COURT:  I have.

24          MR. PATRIZIO:  -- about disregarding the -- and the

25  need for the reworking of the guidelines --

1          THE COURT:  I have --

2          MR. PATRIZIO:  -- as it relates to the --

3          THE COURT:  -- I understand your position.

4          MR. PATRIZIO:  Thank you, Judge.

5          THE COURT:  I would very much like to hear from Mr.

6    Davis.

7          THE DEFENDANT:  May I come up there?

8          THE COURT:  And he -- you may come up here and -- and

9    you're -- you're very free to remove you mask when speaking, if

10   you want to.

11         THE DEFENDANT:  Okay.

12         THE COURT:  And I have your letter in from of me,

13   which I have read.

14         THE DEFENDANT:  Okay.  Thank you for being so patient,

15   your Honor.

16         Ah, I want to thank my family for -- all for being

17   here today.

18         But first and foremost, I want to apologize to the

19   victims, I've hurt.  At the time, I was involved in this

20   behavior, I never stopped to think about how serious my actions

21   were or the implications they had.

22         I rationalized my actions as being something private

23   and convinced myself, I was not harming anyone.  I really only

24   now see, how wrong I was.

25         For my entire life, I have tried to be a perfect

1   student, friend, partner and son.  I choose to bury my darkest

2   thoughts, desires and insecurities to maintain an image and to

3   avoid talking about my struggles.

4           I hid my loneliness, depression, sexuality and

5   suicidal thoughts that consumed me every day, thinking I was

6   only protecting myself, but in the end, I not only hurt myself,

7   but I hurt those around me.  I hurt my family and all of the

8   innocent children in this case.

9           My crime shouldn't have happened.  I went through

10  therapy before, we've discussed this.  When going through

11  therapy in my teen years, I really did not take it seriously at

12  all and that is my fault.  I didn't want to accept help, in all

13  honesty, I was ashamed, so, I didn't want to open up, I was

14  terrified.

15          Ah, really, the only way I saw a way out was to

16  cooperate and -- and get out of therapy as soon as possible and

17  try to move on with my life, I really wanted to bury it, but I

18  really see now that wasn't the best option for me at all or

19  anyone around me.

20          Ah, but I did really realize that you can't move on at

21  all, unless you accept responsibility for your actions and I am

22  trying to do that here today.

23          Ah, in my total disregard for the therapy and my own

24  immaturity in thinking I could fix things myself without the

25  assistance of a professional.  And my superiority complex in

1    thinking I was above it all and didn't -- and didn't have to

2    cooperate the way I was supposed to, it really ultimately led me

3    to re-offend.

4          Ah, I have had a lot of time while incarcerated to

5    reflect, every day I am trying to work on self-awareness and

6    understanding how my actions led me to where I am today.  My

7    desire to transform my life is stronger than ever.  I really am

8    trying to work every day to become the young many, my family and

9    I can be proud of again.

10          I know I've disappointed them so many times and it

11   hurts my heart every single time and I -- even today -- I've

12   tried not to look at any of them in the eye, 'cause I don't want

13   to get too upset, but I appreciate them being here today.

14          I want to assure you and my family, that I will do

15   everything in my power to right my wrongs, I do want to use

16   every resource available during my incarceration and after to

17   work on self-improvement and rehabilitation.

18          I want to, again, apologize, because that's what the

19   important thing is here to the children and their families, it's

20   not just the children that are affected, I know their families

21   are as well.  I am sorry for causing further pain and suffering,

22   I really never wanted to hurt anyone at all.

23          Ah, I want to apologize to my family again, for

24   putting you through so much shame, pain and sorrow and I've

25   acted so against the person I want to be.

1          Your Honor, I know I've committed an inexcusable crime

2     and I trust your judgment, so thank you for allowing me to

3     speak.

4          I will -- just want to touch on a two things, ah --

5          THE COURT:   Yes, that was -- I know, you just reread

6     your letter to me, but I wanted to be sure that you knew that,

7     you know, what you say to me now isn't limited to what you wrote

8     me.

9          THE DEFENDANT:  Yes.

10         THE COURT:  And I want to give you a chance to say,

11    whatever else you'd like to say --

12         THE DEFENDANT:  Yes.

13         THE COURT:  -- beyond what you wrote in your letter,

14    so you're -- please --

15         THE DEFENDANT:  Yes, your Honor.

16         THE COURT:  -- please do.

17         THE DEFENDANT:  Ah, I want to touch on the Max thing,

18    I feel like there's -- ah -- a lot of -- a lot on my part in

19    trying to pass the blame onto someone else and that's not what I

20    want to do at all.

21         I think in communicating, especially, to the

22    psychologist, my whole entire point of mentioning the person at

23    all, was trying to explain that this is a stepping stone that

24    led me to my actions, I am my own person, I can make my choices

25    and my own actions.

1       Ah, but that is really where I -- I tried to explain,

2  this is where I started in this conduct and misbehavior and that

3  led me to further on.  So, I do not want to blame someone else

4  for my own actions.  I am my own person and I can control my own

5  actions.

6           THE COURT:  You do recognize, I assume and, you know,

7  you read your expert's reports.

8           THE DEFENDANT:  Yes, your Honor.

9           THE COURT:  It comes across much differently in the

10 reports.

11          THE DEFENDANT:  Yes.

12          THE COURT:  It -- it -- did they misunderstand what

13 you were saying to them, because their reports read to me, as

14 though Max -- Max got you -- Max convinced you to do this and

15 then, Max got you hooked on the child porn.

16          THE DEFENDANT:  I think where it was misconstrued is

17 combining the two cases together that, I did in my prior case

18 put a lot of blame onto this person, I cannot blame this person

19 for my current case.

20          Ah, my activities with this person, ultimately, led me

21 to make certain decisions, but really, that was me kind of

22 trying to explain and my mindset of -- my involvement with this

23 person in my prior case, not necessarily this case, your Honor.

24          THE COURT:  I want to ask you this once and you have

25 one chance to -- to answer me and, obviously, you're under oath

1   as has you know.

2           THE DEFENDANT:  Yes, your Honor.

3           THE COURT:  Does Max really exist?

4           THE DEFENDANT:  Yes, he does, your Honor.

5           THE COURT:  What is his name?

6           THE DEFENDANT:  Max Marsh.  And I have his user name

7   and I have reported his user name back at my juvenile

8   adjudication.

9           THE COURT:  M-a-r-s-h?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Why was -- why did you call him at various

12  times, Matt or Mike?

13          THE DEFENDANT:  I think that was -- I -- to be

14  completely honest, I can't remember my entire interview with the

15  people on that date, it was absolutely terrifying, so I don't

16  know if I said -- talked out of place.  I don't know if things

17  were written down wrong, I can't tell you that.

18          But I can tell you with a hundred percent certainty

19  that this person has existed and that this person has existed

20  from the very beginning.  And it's not someone I'm trying to

21  make up now as excuses for my actions at all.

22          THE COURT:  Did -- did you delete any and all evidence

23  of any electronic communication with this person?  It's my

24  understanding that law enforcement was not able to find any and

25  as you know, they are pretty good at finding stuff that you

1    thought you had deleted.

2             THE DEFENDANT:  Ah, law enforcement was given my cell

3    phone in my prior conviction due to a search warrant even before

4    my conviction.  They had all of the accessability to any of my

5    chats with Max.  They had the user name, MaxMarsh105 and my

6    lawyer has that information.  And that was told to Officer Tice

7    in an interview to him.  All of that information was given to

8    the state.  I am not sure why that information ever even came up

9    in the case, ah, but that was all handed over to the state.

10            THE COURT:  Okay.

11            THE DEFENDANT:  Ah, I also want to touch on my

12   cousins, because that's a big thing and to -- today, hearing it

13   is absolutely terrible.  I've tried my hardest to reincorporate

14   my family, because my family is a very close family.

15            I've tried very hard to try to reincor --

16   reincorporate myself into my family.  It's very difficult on

17   everyone, especially, in trying to support me and also keep the

18   family together.

19            Ah, at the end of the SAAY Program, that I completed

20   on the state level, ah, whether or not it was completed to the

21   way I should have completed it, the one thing I am proud of --

22            THE COURT:  Was that your probationary program --

23            THE DEFENDANT:  Yes, your Honor --

24            THE COURT:  -- and your therapy?

25            THE DEFENDANT:  -- that --

1          THE COURT:  Well, I don't, I mean, you -- you just

2     said, whether or not, it was completed to the way it should have

3     been completed, you were downloading and viewing child

4     pornography while you were undergoing the -- while you were in

5     the program, right?

6          THE DEFENDANT:  Ah, it was, actually -- I don't know

7     if the details matter, but that was --

8          THE COURT:  Well, they matter to me.

9          THE DEFENDANT:  Okay.

10         That was after that, but while still on the probation.

11         THE COURT:  Okay.

12         THE DEFENDANT:  Ah, but that doesn't, again, excuse my

13    actions, because to me, that's just a calculated thing,

14    obviously, I'm not going to do something like that while

15    completing a program, ah, but I shouldn't have been doing it at

16    all.

17         But, anyway, ah, I guess what I'm trying to say is,

18    I've tried very hard, my one accomplishment, I can say out of

19    that thing is writing a letter of recognition to my cousins, I

20    wrote a letter to each of them individually as well as to their

21    parents to explain to them, that in my mindset and to let them

22    know, all of my faults, reassuring that they did nothing wrong

23    and really trying to reconnect my family.  I've seen my cousins

24    after that event plenty of times, every single holiday, I've

25    seen my cousins, every matter was appropriate and to me, I try

1    my best to bring my family back together.

2            So, I just wanted to let you know, I -- I tried very

3    hard to rebuild my relationship with my cousins and rebuild

4    their trust and, especially, with their parents as well.

5            THE COURT:  Okay, thank you.

6            THE DEFENDANT:  Thank you, your Honor.

7            MR. PATRIZIO:  Judge Pappert, if I could just say one

8    -- one thing?

9            THE COURT:  Okay.  And then, we'll --

10           MR. PATRIZIO:  There was a search warrant in the

11   original case, not the case that the Government brought and that

12   investigator's name was Pipes and -- Trooper Pipes.  And it was

13   Trooper Pipes, who was given the name of -- ah -- this fellow,

14   Max and his Internet thing.

15           And so, again, I'm -- I don't want to get into who

16   said what to whom.  They didn't have it, okay.  But it was given

17   in June of -- ah, what was that date?

18           THE DEFENDANT:  June of '15.

19           MR. PATRIZIO:  June of '15 to Trooper Pipes.  And they

20   did confiscate his phone and did get a search warrant.  But the

21   results of the -- the download and the forensic was never

22   disclosed or whatever, so -- but again I'm not putting blame --

23   I'm not putting blame on Detective Bellis or anybody, I'm just

24   trying to show and I -- and I have a copy of the search warrant.

25           THE COURT:  Well, I -- I don't need it.  Thank you.  I

1   understand.

2            MR. PATRIZIO:  All right, to --

3            THE COURT:  Thank you.

4            MR. PATRIZIO:  -- to show that he's telling me the

5   truth.

6            THE COURT:  Ms. Rotella.

7            MS. ROTELLA:  Well, I don't think he's telling the

8   truth, ah, I will tell you that in our conversation, since he --

9   counsel is bringing up to the Court -- in our conversations

10  prior to resolving this case, he gave the same information to

11  the Government and we actually spoke with the Pennsylvania State

12  Trooper Pipes, who denies ever getting any information from Mr.

13  Davis, so --

14            (Discussion held off the record at 4:09 p.m.)

15            MS. ROTELLA:  -- I -- I think and -- and I would ask

16  the Court, I've just prepared a timeline to -- just to exhibit

17  the information that the Court already has.

18            THE COURT:  May I?

19            MS. ROTELLA:  Certainly.

20            THE COURT:  Yes.

21            MS. ROTELLA:  If I could pass it up, because --

22            (Pause at 4:10 p.m.)

23            THE COURT:  Thank you, Jeff.

24            MS. ROTELLA:  And the reason why I'd call your

25  attention to it, your Honor, it's because -- and I'll -- I'll

1    get more focused in terms of my argument.

2            But if the Court looks at the bottom here in -- June

3    4th of 2015 is when he established his drop-box account, which

4    he told the Delaware County detectives he did so:

5            To obtain and to store his child pornography.

6            That is right in the middle of all of his therapy, all

7    of his court supervision and in the middle of starting his

8    juvenile sentence.

9            If the Court can see from February 3rd of 2016 to May

10   27th of 2016, that is when he uploaded all of these things to his

11   drop-box account, twenty-two thousand -- more than twenty-two

12   thousand -- images and videos of child pornography.

13           The Court will look, he was -- he did not complete

14   sex-offender treatment until March 17th, that is after -- even

15   though he stood here to your face -- and told you, that he did

16   not start doing this before he completed his sex-offender

17   program, yes, he did.

18           And how do we know that?  Because the forensics show

19   us, we have the images, we have his computer, we have his cell

20   phone, so we know that that is not true, he did it while he was

21   still in the program, despite what he -- even today -- wishes

22   for the Court to believe.

23           He stands before this Court, telling you -- and I'll

24   get into the Max thing in a minute -- but even today when you

25   asked him about it, he -- he never gave anybody, the Max Marsh

1   name -- 105 -- until this moment in time, when he stands before

2   you asking for a mitigated sentence that's something -- a world

3   away -- from his guidelines call for in this case.

4           He had two -- two defense experts -- who evaluated

5   him, Dr. Haworth talked to him for over a year, he never once

6   said that, gave any of that information to him, ever, it's only

7   now poof, Max exists, it's -- it's ridiculous quite frankly.

8           And -- and when he's talking to you now about it, he's

9   trying to say, he doesn't blame his former -- he was blaming his

10  former crime on Max -- but not his current one.

11          In any event, I'm -- I'm not going to belabor all the

12  facts in this case, this Court is well acquainted with -- with

13  all of the nuances and all of the criminal offenses, crimes that

14  he committed over years and years involving himself, again in

15  child exploitation offenses.  But I -- and I've well laid out

16  all of that in the Government's memorandum.

17          But I -- I would ask the Court to consider this:

18          In terms of the -- and -- and before I start with that

19  -- I do not come before every court and ask for the top end of

20  the guidelines.  Last week, in fact, before Judge Diamond -- not

21  remarking on his reputation -- I could have gotten a sentence, I

22  believe, that was much higher before Judge Diamond, I actually

23  recommended to the court that he'd vary downward from the

24  guideline range in that case on the same charges that the

25  defendant was facing -- that Mr. Davis faces here today --

1    because in that case, I thought that that was appropriate.  In

2    Mr. Davis' case absolutely not.

3         When -- and it's not a -- a personal thing here, I

4    work for the Government and so, I am in -- I feel like -- the

5    unique position to see how all of these cases are resolved in

6    this district.  And that being the case, I am seeking before

7    this Court a sentence that is at the top of Mr. Davis'

8    guideline.

9         Quite frankly, I toyed with asking for the statutory

10   maximum in this case, but chose to ask this Court for -- finally

11   resolving it -- I think that a sentence within his guideline

12   range, actually, is appropriate, albeit at the very top of his

13   guideline range.

14        And -- and here is why, the driving factor, all -- all

15   of the other justification that I've put in terms of the nature

16   of his offenses and who it is that was targeted and prepubescent

17   children, again, mostly all being sexually abused in the exact

18   same way that he committed his former crimes with the two kids,

19   that were related to him.  The -- the driving factor here, I

20   think, is -- is the history and the characteristics of -- of

21   this defendant.

22        And I don't know how this Court -- and I know the

23   Court won't -- but I -- I don't know how you cannot look at it,

24   his prior offenses in this light.  And -- and that being how

25   they affect this factor, because this defendant had more than

1   any other defendant that comes before the Court, he had a

2   supportive family, he had intensive therapeutic interventions.

3   He -- he had individual therapy from two different sources, he

4   had a group therapy.  The individual and the group therapy were

5   both centered around sex-offender treatment, you can't get any

6   more specific.

7           He had a juvenile probation officer assigned to him.

8   He had court supervision that he was under and he was given the

9   benefit of a probationary sentence on quite frankly, horrific --

10  horrific child-sex offenses, I don't know how that's what he was

11  sentenced to in this case -- in that case.  He had all of those

12  things in place.

13          He had a relationship before he ever started

14  committing these offenses, he had a relationship, inexplicably,

15  the person is still standing here today, even though Mr. Davis

16  repeatedly lied to him and committed these crimes behind his

17  back, including on the day of the search warrant, when Mr.

18  Justino said, he didn't know why he was arrested.  Mr. Davis

19  asked to speak to the detectives outside of Mr. Justino's

20  presence, because he didn't want him to know what he was doing,

21  so he could continue to lie to him.  And that, I would suggest,

22  is exactly what he's doing to the Court here today.

23          The whole notion of Max, the whole notion of this

24  person being in existence, it's ridiculous.  Quite frankly

25  between the defense expert reports that were submitted to this

1   Court and you -- you have much in the way of information as to

2   how this particular defendant thinks.  You have as exhibits, the

3   -- the evaluations that were done back in time, when he

4   committed those juvenile offenses from Dr. Surbeck and from Dr.

5   -- I forget her name, it begins Timmy -- Timmony (ph) her name

6   is.  All of that information is, this defendant repeating to

7   these professionals, what drove him to do these crimes.

8         And I -- I would submit that from the beginning it's

9   been this, I call it, the not-his-fault defense.  It's Max, who

10  introduced the topic of having sex with the younger boys and the

11  defendant -- and this is all in Dr. Haworth's report -- the

12  defendant was uncomfortable with it, but he tolerated it,

13  because he wanted the attention of Max.

14        He -- he blames, the children, he says, the -- the

15  children -- a younger boy walked in on him when he was

16  masturbating and -- and he wanted to educate the boys and -- and

17  he wanted to teach them how it is done and he thought that he

18  was, actually, helping him, that is in one of the evaluations,

19  he -- he thought he was, actually, helping the boys to learn.

20        You have Dr. Surbeck and you have Dr. Rodriguez both

21  saying, that thought pattern, where you think you're -- you're

22  actually doing a favor for the child's sex -- the child victim

23  -- it is very much aligned with every other adult sex offender,

24  because that is exactly what he is.  He's an adult sex offender,

25  he's twenty-four years old here today and he's -- he's not --

1   he's not an adolescent.  He is a young man and he -- he has

2   earned the -- the sentence that is about to be imposed upon him.

3          He claims that Max is the one, who sent him the child

4   pornography and Max is the one that introduced him to the KIK

5   group, where he could correspond with other child-sex offenders.

6   Max's conversations influenced him to exploit the situation --

7   the situation -- with a nine year old.

8          And I don't know -- I don't know if it's -- it's --

9   the Court has seen here or if it's been significant for the

10  Court, the -- the defense seems to have a great difficulty in

11  terms of actually, articulating what it is that he did to those

12  boys.

13         I -- I would even say, you -- you would feel more

14  comfortable with, perhaps, giving any kind of mitigation in this

15  case, if he had simply come before the Court and, at least,

16  demonstrated some kind understanding as to the harm that he

17  caused on these children.  If he is willing to this to his two

18  cousins, who loved him, who respected him and who were part of

19  his family, he was entrusted with their care, he babysat them on

20  a regular basis, if he's willing to cross the line with those

21  two children, no child is ever safe in this community.

22         And -- and what -- I don't know how he could have an

23  understanding about anally raping a six-year-old or digitally

24  anally -- digitally penetrating a nine-year-old or forcing both

25  children to have -- perform oral sex on him and him doing the

1    same to them or masturbating them.

2         But every time it's talked about, it's talked -- even

3    the words he used today, this behavior, that's what -- that's

4    what Mr. Davis said, this behavior, he didn't articulate what he

5    did, because of course, it's -- it's too vulgar and it's too --

6    ah, depraved.  But it certainly would go a long way in terms of

7    being able to show that he does recognize what he did or -- or

8    to have some sort of his defense, one expert talked about him

9    having remorse, but I -- I don't see any of that today.

10        He's not -- he's not -- he's talking about apologizing

11   to the -- to the -- to the victims, who were depicted in his

12   images here, but there is no sense of understanding of the

13   extreme harm for the kids that were involved in this offense or

14   his previous one.

15        And that's what I was talking about earlier, the --

16   the circumstances of the -- what's depicted on these videos.

17   They are horrific, they are really difficult to watch, it is,

18   horrific, especially, the -- the horrible abuse that is being

19   inflicted on those really young children.

20        And -- and especially, the one video, each -- each of

21   the occasions where he was transferring this child pornography

22   to his drop-box account and distributing it out, there is one

23   day, where there was only one video and that's what he did while

24   he was at West Chester University, he chose that video,

25   specifically, and put it into a folder that he -- that was

1    marked, Oh, My God, OMG in capital letters.  That video depicts

2    an infant, who was just weeks old, it appears, who is being

3    horrifically sexually abused where -- and I did detail it in --

4    in the Government's memorandum.

5           There is sound on the video, the -- the adult sex

6    offender is saying, that this is my grandson and I'm gonna make

7    him -- he's gonna -- I'm gonna make him, ah -- you're gonna see

8    what happens when I -- when I abuse him.  And he inserts his

9    penis to such an extent on that small baby, that the baby is

10   actually, choking and can't breathe, the face is turning red,

11   the baby is screaming when he removes his penis.  And then, he

12   continues to assault the child.

13          That's the one video that he accessed from school and

14   then he chose to save and to place in a special place as part of

15   his drop-box account.

16          I -- I don't know how any human being could ever take

17   sexual pleasure in -- in something like that -- I don't -- and I

18   don't how you can fix somebody like that, I don't think you can.

19          So, in terms of his prior abuse that this Court should

20   consider in terms of what risk he faces and -- and how -- how he

21   will perform, you know, as the Court knows, it was multiple

22   boys, they were so young, they're both prepubescent, multiple

23   occasions while they were babysitting, it's -- it's well laid

24   out in the Government's memorandum.

25          But the fact that he could still now today bring

1    himself to say, that the most basic of what is obvious to

2    everybody else in the room, which is that, yes, he is sexually

3    attracted to children.  Yes, he did this of his own volution, he

4    did it willingly and he did it to satisfy his own sexual urges.

5         That -- that, too, would probably go a long way in

6    saying, all right, well, maybe, you recognize what it is that

7    you've done in small ways and there is some hope for you.  But

8    he can't do that, not even today, not even knowing what he's

9    facing.

10         The -- the collection here, significantly it is

11   overwhelmingly, prepubescent boys, all around the same age as

12   the kids that he sexually abused that were in his family.

13         The -- the ridiculousness of this -- of this Max thing

14   that I -- that I told you about, again, blaming him.  The fact

15   that he could say that he was -- ah -- engaged with him and that

16   an online person can convince you to go, sexually abuse your own

17   six and nine year old cousins, is -- it's quite frankly, just

18   ridiculous, the whole thing is ridiculous.

19         He just didn't want to admit to his family that he was

20   the one that did this.  And he had to in some way, shift the

21   blame somewhere else.

22         But then to say that after this whole thing happened

23   and he was outed and he's on probation, that he then reconnects

24   with this Max -- and by the way, we're calling him, Max, but

25   really, he identified him as Mike at first, right around the

1   time when he was first arrested and, supposedly, still engaging

2   with him.  Of course, there's no forensic evidence on any device

3   ever of Mike or Matt or Max, there is nothing anywhere.

4          And so, it's Mike and then, of course, it's Matt and

5   that's in 2017.  And then, because he forgot what he told,

6   because it was not the truth in 2020 and in late 2019, when he's

7   talking to his defense experts, he gives yet another name, this

8   third name.  Of course, nobody confronts him or even asks him,

9   why would you give a different name, if you were so involved in

10  this person -- with this person?

11         And quiet frankly, that's because they wanted to

12  present a story to this Court that just is not accurate about

13  what happened.

14         But to say that, you know, this mystery person is now

15  responsible for the second child-exploitation crime, I mean,

16  it's almost like, when you would get caught -- I don't know --

17  smoking when you were a kid, my friend asked me to hold my

18  cigarettes, I mean, that's -- that's what he said, this person

19  asked me to hold his online child pornography, which just is --

20  it just makes no sense, whatsoever.

21         And so, I've outlined for the Court, he's said

22  different things at different times, you know, saying he was

23  threatened, saying he was coerced, saying he was induced, you

24  know, again, of course, not providing any information,

25  whatsoever.  He -- he just does not accept true responsibility

1    for his crimes.

2           And although the defense experts wanted to opine to

3    you, that he has, I -- I'd ask this Court, you know, take a -- I

4    know, you've read the reports, but there's lines in say, Dr.

5    Haworth's report, the first one:

6           The defendant takes full responsibility for

7           submitting to Max.

8           And he recognizes that he allowed himself to be

9           drawn in by Max.

10          I mean, that's not full responsibility, it's not.

11          And in Dr. Zakireh's report on Page 5:

12          The defendant traces his pursuit of child pornography

13          as well as his sexual offending against his male cousins as

14          a direct result of the influence, persistent persuasion,

15          enticement or otherwise in the service of pleasing or

16          maintaining his relationship with Max.

17          I mean, that part of it is -- is all over -- all over

18   here, because -- and I'd ask you, even to today, Ryan Davis has

19   had years to think about what he wants to write to this Court

20   and what he wants to say to this Court.  What does he say on

21   Page 2?  He talks about, he wants to accept responsibility for

22   his mistakes.  There is nothing about anything that he has done

23   in any of his criminal escapades.  Back in juvenile court, here

24   today as an adult, all the years that he committed it, they were

25   conscious choices, there was -- in no way were these mistakes.

1     And again, that goes towards his recognition that he

2   does accept responsibility and his recognition of what he's done

3   here.

4     And I don't see any of that in this letter here, there

5   is nothing -- nothing -- in here that talks about what he did,

6   the harm he caused, nothing whatsoever, it -- it talks about him

7   and that's -- that's what he's displayed this whole time.

8     I don't know what else could be in place for a

9   defendant, the family support that I've talked about, the

10  therapeutic support that I've talked about, the fact that he

11  committed these crimes while under court supervision, after

12  having already been outed, so that everybody around him, knew

13  what had done and was participating in trying to help him to get

14  past what he had done and -- and rehabilitate himself and do

15  something different with his life, all of those things, instead,

16  he chose to lie to everybody around him, everyone.  And involved

17  himself, again in child exploitation offenses.  And that is

18  exactly what he is going to do whenever he is released.

19     So, the purposes of punishment, I understand that the

20  Court had to consider his risk of recidivism or -- or you expect

21  him to act once he is finally released from prison.  But I -- I

22  would ask, punishment and also protection of the public are

23  really the two driving factors here for this sentence.

24     And -- and I think that he has demonstrated history

25  will repeat itself and he's earned himself here, a sentence at

1  the top of his guidelines and I would ask that the Court impose

2  that.

3          THE COURT:  I appreciate it --

4          MR. PATRIZIO:  Judge --

5          THE COURT:  -- thank you, Ms. Rotella.

6          MS. ROTELLA:  Thank you.

7          MR. PATRIZIO:  -- Judge, I wanted to object.  I never

8  believed that today's sentencing was going to be about whether

9  Max was a real person and --

10          THE COURT:  Well, let me stop you right there and from

11  further embarrassing yourself, okay?

12          MR. PATRIZIO:  Myself, Judge?

13          THE COURT:  Yes, yourself and your client by

14  extension.

15          Because what that tells me is, you never read a word

16  of what you paid your experts to write.

17          MR. PATRIZIO:  I've read every word, Judge.

18          THE COURT:  Max is an essential component to their

19  reports and my assessment of whether your client has accepted

20  responsibility or is capable of rehabilitation and may

21  recidivate and --

22          MR. PATRIZIO:  Then, I ask for an adjournment,

23  Judge --

24          THE COURT:  -- for you to say, given the --

25          MR. PATRIZIO:  -- Judge --

1          THE COURT:  -- Government's position all along in this

2     case, which is -- then, you never read a word of what Ms.

3     Rotella filed with me, either --

4          MR. PATRIZIO:  That's not true, Judge.

5          THE COURT:  -- it's very clear that they think it's

6     all made up.

7          MR. PATRIZIO:  And --

8          THE COURT:  And I'm now after listening to six hours

9     of this, I agree with them.

10          So, for you to say, you never knew Max was going to

11     come up --

12          MR. PATRIZIO:  No, I didn't know it was gonna be come

13     -- coming up in this fashion.

14          THE COURT:  Well, of course, it was --

15          MR. PATRIZIO:  Then, Judge, I'd ask for --

16          THE COURT:  -- and your client got up and made it a

17     part of the case.

18          MR. PATRIZIO:  -- Judge, I'd ask for an opportunity to

19     continue this matter to --

20          THE COURT:  Are you kidding me?

21          MR. PATRIZIO:  No, I'm not kidding, Judge, because --

22     because, Judge, I have -- I have an exhibit now, okay.

23          THE COURT:  I -- I don't care what you have, this has

24     been going on since -- the anniversary is today or tomorrow, May

25     of 2014 and for the first time in seven years after the

1   investigations are over, after he could have helped himself,

2   after he sat with his experts, but before I pronounce sentence,

3   we --

4            MR. PATRIZIO:  Judge --

5            THE COURT:  -- have this revelation --

6            MR. PATRIZIO:  -- Judge --

7            THE COURT:  -- are you out of your mind?

8            MR. PATRIZIO:  I'm not out of my mind, Judge.

9            THE COURT:  Then, sit down --

10           MR. PATRIZIO:  Judge, I have --

11           THE COURT:  -- sit down --

12           MR. PATRIZIO:  Are you --

13           THE COURT:  -- now.

14           MR. PATRIZIO:  -- you're not allowing me to speak,

15   sir?

16           THE COURT:  No, I am not, sir.

17           You have had since nine o'clock this morning to speak,

18   are you kidding me?

19           MR. PATRIZIO:  My client asked me to object, Judge.

20           THE COURT:  I don't care what your client asked you to

21   do, it's patently ridiculous.

22           MR. PATRIZIO:  I have a --

23           THE COURT:  I haven't become this irritated with a

24   lawyer in seven years on the bench with, maybe, one exception.

25           And to those of you in the background, I apologize.

1    Okay?

2            MR. PATRIZIO:  Judge, could I --

3            THE COURT:  But you to say, what you just said after

4    seven years of investigations and therapies, look what you're

5    doing to his mother.  I can see her, you can't.

6            Now, we're going to adjourn.  I am going to collect my

7    thoughts.  I am going to come back in a measured and careful way

8    and I am going to announce my sentence and I am going to

9    articulate the reasons for it and you are going to listen.

10           We're adjourned for -- until 4:45, it is now, 4:30,

11   thank you.

12           DEPUTY CLERK: All rise.

13           (Recess at 4:30 p.m.)

14           (Resumed in open court at 4:48 p.m.)

15           THE COURT:  I have a lot of notes and a lot of

16   materials, I will be flipping back and forth during my

17   discussion of the appropriate sentence in this case.

18           I have -- I'd like to start by talking to Ryan's

19   mother and his family.

20           And no one can say, they know how you feel, I am not

21   going to try.  I know it's been seven years now of dealing with,

22   you know, the shock and everything that comes with it, the

23   criminal justice issues and I am not going to pretend how many

24   of those nights have gone, but I know you've suffered.

25           And I am very sorry for what's happened in the last

1  seven years.  And I -- I was not the judge before whom Ryan pled

2  guilty, so I never had a chance to see anyone before today, but

3  I am just very sorry for everything that you have gone through,

4  for everything you have had to hear today and I know that,

5  maybe, you are learning now that even everything you heard today

6  was the -- the very tip of the iceberg.

7        There were descriptions of other images and videos

8  that Ms. Rotella did not get into, but that I read.  And I

9  didn't need to see the videos to appreciate the depravity of

10 them, but I also didn't want you to.

11       I apologize for everything that's brought us here

12 today and you have my sympathies and I apologize -- apologize in

13 advance for what you're about to hear from me, because it's not

14 going to be very easy.  But I can assure you that as much as you

15 wish you weren't here, I wish I wasn't here, either, I can

16 assure you of that.

17       This is the most difficult thing that judges have to

18 do and these cases present some of the most difficult challenges

19 for us.

20       And as in all my cases -- and I'm not special, my

21 colleagues do the same thing -- I read everything I could read

22 multiple times, because when you are dealing with offenses like

23 this and guideline ranges like this, you just worry that you're

24 not going to get it right.  And in many ways, there is no right,

25 it's all wrong.

1    I have spent this entire week, reading about this case

2    to the exclusion of my other cases, all day, every day, so that

3    I could say, that I did my best to give an appropriate sentence

4    in a case like this.

5    And when child pornography is involved and federal law

6    is violated, as you've heard in various forms today, the

7    advisory sentencing guidelines are often very, very high.  And

8    as judges, we all struggle with that and we struggle with

9    everything I have been struggling with since Monday morning and

10   will struggle with after I leave here today to be very honest

11   with you.

12   Is this the right thing, is there a better way?  Are

13   these appropriate time periods?  And you look for reasons to be

14   able to explain why a guideline sentence is not appropriate and

15   those reasons come in many different forms.

16   After three days of reading and roughly eight hours of

17   listening, there are no reasons to depart downward or vary

18   downward from the guidelines in this case.

19   I am going to sentence the defendant to 240 months

20   incarceration, a lifetime of supervised release, a $200.00

21   special assessment.

22   And I will also order the defendant to pay $15,000.00

23   in restitution pursuant to 18 United States Code, Section 2259

24   to the victims of the defendant's crimes, who have petitioned

25   for restitution.

1          I find the defendant has no ability to pay a fine.  He

2     is unlikely to be able to pay a fine in the future and to the

3     extent that he is able, I would prefer that resources are

4     directed to restitution for the victims.

5          And let me summarize the reasons for my sentence as I

6     am required to do and for his family, the law requires me to

7     articulate within the confines of certain legal requirements,

8     why this is an appropriate sentence.

9          And we start with a factor known as the nature and

10    circumstances of the offense.  And I will tell you, that the

11    guidelines in these cases are so very high, sometimes, and in

12    most of the cases, at least, that I have presided over, there

13    has never been any physical contact with children.

14         These are cases where people are downloading and

15    reviewing these materials and we focus on what Congress and the

16    Sentencing Commission has told us, is the danger brought to

17    society by people, who just download them, who never put their

18    hands on a child and this case, it's different and we'll talk

19    about that for the right reasons.

20         But the United States Supreme Court has recognized

21    that child pornography harms and debases the most defenseless of

22    our citizens.

23         And what gets lost today in the expert testimony about

24    the relevance of the prior convictions and whether his prior

25    sexual abuse of his young cousins makes him more likely to

1  recidivate, less likely to rehabilitate, what gets lost in all

2  of this, is that this sentence is about those children, who were

3  exploited when they were filmed and the constant harm and re-

4  exploitation that they suffered.

5         And the letters from the victims, who will receive the

6  restitution award in this case, talking about how the rest of my

7  life, all I do is worry about, what if someone sees that video,

8  when I'd meet a girl, is she going to see it?  When I meet her

9  parents, when I interview for a job and they do a background

10  check on me, will someone who walks past me, recognize me from a

11  pornographic video that an adult made while they sexually

12  exploited me and abused me?

13         Congress has found that child pornography is a form of

14  sexual abuse, which can result in physical or psychological harm

15  or both to the children, who are filmed.

16         Our Court of Appeals has acknowledged these findings,

17  saying, that Congress found little distinction in the harm

18  caused by a pedophile, be he a distributor or a mere consumer in

19  child pornography, because the mere existence of and traffic in

20  child pornographic images creates the potential for many types

21  of harm in the community and presents a clear and present danger

22  to all children.

23         Child pornography inflames the desires of pedophiles

24  who prey on children, thereby increasing the creation and

25  distribution of child pornography and the sexual abuse and

1   exploitation of actual children, who are victimized as a result

2   of the existence and use of these materials.

3        Congress considers the transportation of child

4   pornography a particularly egregious crime and has set high

5   penalties for it based on its finding that exchanging images

6   contributes to the growth of child pornography and harms

7   increasing numbers of children.

8        This case today, isn't about his cousins, though

9   they're relevant for the reasons you've heard the experts talk

10  about.  This case today is about those defenseless children, who

11  have been subject to some of the most horrific abuse you can

12  ever imagine.  Ms. Rotella gave you one example, she spared you

13  of many others.

14       This case involved more than 22,000 images and videos

15  depicting horrific abuse of children, prepubescent children,

16  toddlers, infants.  They depicted sadism, masochism, rape,

17  toddlers, infants screaming in pain, it doesn't get worse than

18  this, it just doesn't.

19       The defendant collected child pornography for almost

20  three years after already having been convicted of child-sex

21  offenses, while pending trial, while on probation, while

22  undergoing therapy and I'll talk more about this.

23       Ms. Rotella is right, because that's a predictor for

24  us, that tells us whether this person is amendable or capable of

25  the type of rehabilitation that we're going to need as a society

1    when he's out.

2              (Pause at 5:01 p.m.)

3              THE COURT:  Over six years ago, Dr. Catherine Surbeck

4    (ph) perform a psycho/sexual evaluation on Mr. Davis, it's part

5    of the records in this case, it's part of what I read.  Dr.

6    Surbeck among other things, recommended offense specific

7    treatment.  She focused on the need to clarify the discrepancies

8    between Mr. Davis' version of events and his young cousins'.

9    She noted that:

10             He needs to honestly address his intentions and

11         motivations.  He needs to develop full accountability

12         for his actions.  Honestly, acknowledge the reasons for

13         his behavior.

14             That was on January 13, 2015, he still hasn't done any

15   of that.

16             This is my seventh year doing this, I don't know more

17   than I know, but what I do know is when a defendant is sincerely

18   remorseful.  I do know when a defendant really accepts

19   responsibility.  I do know when a defendant is willing to

20   acknowledge what he's done and to try to get past it.  And Mr.

21   Davis has none of those qualities, his allocution to me

22   confirmed that.

23             And we'll get into the relevance of Max, it's less

24   relevant to me for different reasons than I think it was to many

25   of the lawyers in the courtroom.

1        I didn't see a thing in what I read for three days or

2   heard for eight hours, that credibly showed me or convinced me

3   that Mr. Davis has done anything that Dr. Surbeck wanted him to

4   do in January of 2015.

5        In her report, Dr. Rodriguez, whose evaluation and

6   diagnoses, I found credible.  I cannot say the same thing for

7   the defense experts, their findings were not credible and on key

8   areas of their testimony, their conclusions are simply not

9   credible.

10        Dr. Rodriguez's assessment is consistent with all of

11   the evidence and the records and the materials I've read in this

12   case.  I appreciate and respect that when defendants retain

13   expert witnesses or the parties in civil cases retain expert

14   witnesses, those witnesses are retained to offer an opinion

15   that, hopefully, supports the defense of the case, but they have

16   to be credible.

17        And with all due respect to both doctors for reasons,

18   I'll discuss, there was an extraordinary amount of willful

19   blindness applied to the facts of this case by the experts and

20   that willful blindness colored their opinions and hurt their

21   credibility.  I did not find that to be the case with Dr.

22   Rodriguez.

23        Dr. Rodriguez in her report -- and I'll augment it

24   with my thoughts on her testimony -- said among other things:

25        She fears that the nature of his problems, suggest

1          treatment would be challenging.

2          There is no doubt to me based on everything I've seen,

3     read and heard, that treating him will be challenging.

4          One of the more material aspects of this case and

5     about my decision was also a subject of the experts' debate.

6     Dr. Rodriguez pointed out, that among other things:

7           Mr. Davis minimized his deviant sexual desires

8        and did not acknowledge at all, any sexual interest in

9        children.

10          Seven years later, countless hours of psychotherapy

11    later, four if not five psychosexual evaluations later, he

12    denies to this day, having a sexual interest in children.  You

13    don't have to be an expert to know, that's completely

14    ridiculous, I guess, it would help but you don't have to be.

15          How do you explain his conduct with his cousins?  How

16    do you explain the materials he sexually gratified himself while

17    watching and looking at?  Of course, he has a sexual interest in

18    children, that's why we're here.

19          But what that tells me is, if after all this time --

20    and Ms. Rotella, you know made a point and it's something I

21    think about a lot when defendants finally have the opportunity

22    to stand before me, many have been incarcerated for a while pre-

23    sentencing or have been under investigation for years and this

24    is their chance -- this is their chance to tell me, why you'd

25    deserve a break.  Why you don't fit the type of person that

1   Congress is afraid -- so afraid of -- with these laws.

2          And there are days like today, when all I can say is,

3   that's all you've got, really?

4          And when I have someone in front of me, who will not

5   acknowledge that he has a sexual interest in children, what am I

6   supposed to think about his capability for rehabilitation and

7   whether or not, he will do this again?  I am sure, the experts

8   would say, that's the first thing you'd need, you need to admit

9   why you did what you did.

10          As a Probation officer with whom I work on these cases

11   says, you need to have your Come to Jesus moment with yourself

12   here, that's where it starts and seven years later, it hasn't

13   even started yet, think about that, it hasn't even started.  The

14   process of rehabilitation -- of healing -- it hasn't even

15   started yet.

16          And he has had more individual therapy than anyone

17   I've ever had in front of me on a case like this, seven years

18   worth.  Four or five different evaluations.

19          So, when I look to the facts of the case and say, gee,

20   what -- what can I look to to justify a lesser punishment here?

21   What confidence can I have that this is a person, who won't be a

22   danger to society when we release him?  I have nothing -- I have

23   nothing.

24          Ms. Donnelly's colleague in the Probation office said

25   to me the other day, you know, your Honor, when we supervise

1   these people, the worst fears we have is, are they going to turn

2   watching pornography into putting their hands on a child?  And

3   that's the worst fear I have, it's the worst fear we should all

4   have.  He's already done that and after seven years, he has not

5   been honest with anybody about why he did it, not his family,

6   not Mr. Justino, who didn't even know about this, not his

7   lawyers and surely as heck not his experts.  And not me and I'm

8   relevant to this determination it would seem.

9           Dr. Rodriguez believes and wrote that Mr. Davis:

10          Does not think he needs help to control his sexual

11      impulses.

12          She so testified today as well, I believe.

13          (Long pause at 5:12 p.m.)

14      THE COURT:  You know, another thing that's very

15  important to me and that further prevented me from ignoring the

16  guidelines in this case, is the timeline of what happened here.

17  And when I think about whether this defendant can be

18  rehabilitated, can be put back in society without being

19  dangerous, I've had a seven-year test period to look at it.

20          And the experts tell us all those factors that should

21  indicate that he will not commit these offenses again and they

22  talk about, he's in a stable relationship, a supporting family,

23  above-average intelligence, a good student, but he was engaging

24  in all of this conduct while he had all of that, with all of

25  that individual therapy layered onto it, while under the threat

1   of a jail sentence in state court.

2          Because before that plea bargain and that probationary

3   sentence, he didn't know what was going to happen.  While under

4   the court's supervision, he's doing all of this, while he is in

5   therapy, he's doing all of this, while he's in a committed

6   relationship, he's doing all of this, he's accessing these

7   videos at Mr. Justino's mother's home.  I read about how helpful

8   he was around her home, that's not the only thing he was doing

9   when he was at your home.  I'm sorry to point this out, but it's

10  very relevant to how I have to look at the case, I know it

11  hurts, I'm sorry.

12          (Pause at 5:16 p.m.)

13          THE COURT:  Let me come back to the experts under

14  another factor, but let's turn now to the defendant's history

15  and characteristics, which is the second thing that I'd need to

16  consider.

17          I've read everything very carefully and repeatedly.  I

18  know that his mother and father divorced when he was one and his

19  father showed little interest in him and I'd credit how that

20  affects a young boy growing up and that's a tough card, he got

21  dealt and there's no way around that.

22          He was raised primarily by his mother in what Mr.

23  Davis termed, an upper-class lifestyle.  There were no domestic

24  issues, neglect or any kind of physical or sexual abuse in his

25  household.

1          He struggled with his sexual orientation, admittedly

2     and -- and bullied in school, that's not easy coping with as a

3     young man.  I fully appreciate and respect that.

4          Despite his struggles, he was a very good student in

5     high school and in college.  There is no documented history of

6     drug or alcohol abuse and I find that there probably wasn't any

7     and whatever someone said at the FDC in Philadelphia it doesn't

8     carry any weight with me, I don't -- I didn't see anything that

9     indicated that he had an issue with drugs or alcohol.

10          He had a very good employment history.  No history of

11     mental-health treatment until the age of seventeen when charged

12     in the underlying state case.

13          We, of course, in considering his history and

14     characteristics have to consider his prior criminal conduct and

15     the prior adjudication for sexually abusing his two young

16     cousins, age six and nine while babysitting them.

17          What a horrible violation and betrayal of the trust

18     those boys' parents put in him.  He was entrusted with their

19     care, they loved him, they looked up to him, he abused them over

20     multiple days.  I won't repeat what he did to them physically,

21     no one needs to hear that again.

22          When caught, he lied, he tried to blame the children

23     for what happened -- they're six and they're nine -- that it was

24     their fault.

25          And that gets to blaming others and that's where Max

1    becomes relevant, because again, I have to look at everything

2    that's in front of me and decide, has this person truly accepted

3    responsibility?  Is this person truly remorseful?  Can this

4    person take the first step toward being changed or being healed

5    by admitting what he did and why he did it?

6          And we'll discuss Max in the context of the lack of

7    credibility, in the expert reports as well.  But you can make up

8    your own minds as to whether this person really existed.  I kind

9    of doubt it, it's not really material to my assessment of the

10    relevance of this person.

11          I do believe everything that Mr. Davis told during his

12    allocution, is not credible, I do not find it to be credible.

13    There is nothing in the records -- voluminous records --

14    evidence that the Government collected in this case, which could

15    corroborate that in any way.  The doctor certainly didn't

16    attempt to.  I just don't believe it.

17          And if I find that that's not credible, I find that in

18    his opportunity to tell me, why the guidelines aren't

19    appropriate, he stood right there under oath and lied to me

20    seven years later.  I -- I don't know how you'd take from that

21    anything other than, I have nothing to believe that the

22    guidelines shouldn't apply, nothing and I looked really hard, I

23    really did, all week.

24          He went to great lengths to conceal his knowingly

25    illegal conduct and destroyed evidence of his crimes.  And let

1   me talk about -- we'll save that for later.

2          (Pause at 5:22 p.m.)

3          THE COURT:  I am required to consider how the sentence

4   and the need for the sentence imposed will reflect the

5   seriousness of the offense, promote respect for the law and

6   provide just punishment for the offense.

7          As serious a sentence as this is, there is an argument

8   to be made that it is not serious enough given the conduct.  But

9   my job isn't to outdo the seriousness of the conduct, my job is

10  to impose a sentence that is sufficient, but not greater than

11  necessary to comply with the purposes set forth in those factors

12  that I'm going over with now.

13         To promote respect for the law, I hope it does because

14  Mr. Davis has none -- none.  And we know he has none, because he

15  was breaking the law while under probation from breaking the law

16  the last time.

17         And his denial and his lies and his concealments and

18  his excuses have continued right through when he spoke to me.

19  Sometimes, I don't expect much and I feel like I don't demand

20  enough, but gee whiz, I'd appreciate not being lied to during an

21  allocution, that would have been a nice start.

22         These were heinous crimes and he still refuses to come

23  to terms with it.  As I mentioned in discussing respect for the

24  law, he schemed long, hard and often to avoid detection and

25  cover up his crimes.  He committed the crimes while under court

1    supervision.

2           As a juvenile, he received -- Ms. Rotella is correct

3    for the nature of the offenses -- an extraordinarily lenient

4    sentence for what he did.  And again, today isn't to make up for

5    that, that's that, we're here on a different issue.

6           But if those circumstances didn't cause him to even

7    pause -- and that's really what we have here, right -- he just

8    ran through the stop sign, he never even slowed down.  And how

9    can I assess what respect for the law, he has in any context

10   other than that?

11          That kind of feeds in to the need to afford adequate

12   deterrence to criminal conduct.  And when we talk about

13   deterrence to criminal conduct, there are two types of such

14   deterrence, we refer to them as general and specific.

15          And general, loosely defined means, you want someone

16   to see what can happen to them, if they commit crimes like this,

17   so that they don't do it.  We want to deter people, generally

18   from going down this road, particularly, in federal court.

19          Specific deterrence refers to the specific person, how

20   do we deter this person from doing this again?  And a guideline

21   sentence is required here, again, because of the nature of the

22   crimes, but more relevant to me, the fact that -- as I've

23   mentioned -- he just shifted gears the last time he was caught.

24   He went from the hands-on abuse right in to the child porn, but

25   he wasn't deterred at all, not at all.  And if you'd look at the

53

1    timeline that Ms. Rotella put together, there is no other

2    conclusion that I can reach.

3         This is the Court's best effort based on all of the

4    facts of this case and the applicable law and the advice of the

5    guidelines to try to convince Mr. Davis that he cannot do this

6    again when he has the chance to rejoin society, the sentence

7    alone won't do it, the treatment will do it, his commitment will

8    do it, starting with his honesty to himself and to all of you,

9    that's where it has to start.

10        I am required to consider a factor that I have to

11    consider in every case, but it is particularly relevant, I

12    think, in these cases and particularly in this case.

13        And that is the need to protect the public from

14    further crimes that the defendant might commit and we all worry

15    about this and any judge who says, he or she doesn't, is not

16    being honest with you.

17        As Dr. Rodriguez pointed out in her way -- in her

18    report and her testimony -- and as I mentioned earlier, so many

19    of these cases involve just the viewing of the materials.

20        And can we protect children from being exploited again

21    by this person when they're released?  But when they've

22    previously committed a contact offense -- and you heard Dr.

23    Haworth talk about it as well -- that's relevant to assessing

24    the risk to the public, the ability to rehabilitate and whether

25    that person will recidivate.

1       And when they put their -- when it's more than just

2   looking at material, that individual is at a different level now

3   and that's part of the history that the experts had to deal with

4   in this case.  And I'll be critical of the defense experts in a

5   minute, but they had a tough set of facts to work with, okay.

6       We know that it's possible for Mr. Davis to turn his

7   fantasies to reality, because he's already done it.  And I

8   forget, if it was Dr. Rodriguez or Dr. Hawthorne (sic), past

9   behavior is the best indicator of future behavior, it's only

10  common sense.

11      So, let's talk about Dr. Rodriguez's conclusion about

12  the risk of recidivism.

13          (Pause at 5:31 p.m.)

14      THE COURT:  Dr. Rodriguez told us, that Mr. Davis

15  acknowledges stimulating himself to child pornography, yet

16  denies having any sexual interests, thoughts or fantasies

17  involving children.  Medically, factually, legally or otherwise,

18  that just doesn't seem to make a lot of sense.

19      She is concerned about his resistance to change.  As I

20  mentioned, her assessment was more consistent with the evidence

21  and the records and it was, thus, more credible.

22      She explained why he was diagnosed, she diagnosed him

23  with a pedophilic disorder.  She told us about how he feels a

24  constant pull to return to child porn while in his relationship

25  with Mr. Justino.  She calls him a moderate to high-risk

1   classification.  It was Dr. Rodriguez who said:

2         The risk is even higher when that person has committed

3     conduct while on supervision.

4         Dr. Rodriguez defined for us, pedophila and explained

5   why Mr. Davis fits all the criteria for it.

6         Doctors Zakireh and Hawthorne (sic) in my opinion

7   strained awfully hard to avoid such a diagnosis, when all of the

8   materials in front of them led to one.  And when you hear Dr.

9   Rodriguez explain the diagnosis and match it up with everything

10  that she reviewed and all of her discussions with Mr. Davis, it

11  becomes clear that that's what we're dealing with.

12        Dr. Rodriguez feels that Mr. Davis is an above-average

13  risk to recidivate for at least, eleven reasons:

14        His age, his history, the fact that his victims were

15  males, her evaluation, the fact that they were diverse sexual

16  offenses, that he engaged in these offenses while undergoing

17  treatment and undergoing -- and under court supervision and in a

18  stable relationship.

19        I don't know if Dr. Rodriguez drew special attention

20  to Point 10, but I did, he minimized and rationalized his

21  conduct.  And I think that's where now, Max becomes a little

22  more relevant.

23        And why, I believe for a number of reasons, that

24  Doctors Zakireh and Haw -- Haworth -- Haworth -- I mispronounced

25  his name, I apologize -- why their testimony and their opinions

1   just aren't credible.

2           Now, what became clear to me after Dr. Zakireh's

3   testimony, was that the defense realized, gee, this Max thing is

4   kind of an issue, because it really did undercut the credibility

5   of Dr. Zakireh's testimony.

6           So, it appeared to me that Dr. Haworth had an

7   additional mission during his direct examination and that was to

8   mitigate whatever damage Ms. Rotella was able to accomplish with

9   Dr. Zakireh through Max.  So, you will recall Dr. Haworth

10  getting up there as soon as he could saying:

11          Oh, he -- oh, I want to be clear now, he never

12      presented Max in a devil-made-me-do-it context.

13          Which unfortunately did nothing but hurt Dr. Haworth

14  more, because when you look at his report, of course, that's

15  what he did.

16          And let the fact that Dr. Haworth took this without

17  even checking it, without doing anything really that he could

18  have done to look under the hood to verify this, told me that

19  this was a way to get to a result that Dr. Haworth wanted to get

20  to for his client.

21          And if I'd just take Mr. Davis' word on everything, I

22  can construct my opinions accordingly.  He should have and could

23  have looked further into whether or not, this was even true.

24          But frankly, that's not all that important to me, what

25  is important to me is how fundamental Max is to Dr. Haworth's

1    conclusions and his assessment of Mr. Davis.

2         Ryan reported Max talked repeatedly about having sex

3    with younger boys and normalizing it, he indicated how the boys

4    were curious and liked it.  Ryan reported that, though,

5    initially, he was uncomfortable, he tolerated this discourse and

6    persisted, because he so wanted the attention and feelings of

7    being desired that Max gave him.

8         Ryan explained, Max ultimately wanted me to take

9    videos and photos of me engaging in sex acts with the two boys,

10   his cousins.  Ryan was fearful that if he didn't do what Max

11   wanted, I would lose it forever.  I was afraid Max would find

12   someone else to entertain with what we could discuss.  He

13   tolerated -- Ryan did -- the contents to stay connected.  He

14   eventually, hoped to get to something else, something more

15   personal.

16        Ryan discussed how he was attracted to Max, trusted

17   him.  Ryan explained that when he disclosed that he babysat his

18   cousins, Max started to tell Ryan how he -- Max -- engaged in

19   his own -- in his own young cousins in sex.  He told Ryan, his

20   cousins liked it.  Max encouraged Ryan to do sexual things with

21   the boys, that he babysat.

22        Ultimately, these conversations influenced Ryan to

23   exploit the situation with Matteo, walking in on him in the

24   bathroom.  Max exploited Ryan's vulnerability, immaturity,

25   feeling isolated and unloved.  Ryan would do anything he could

1  do to keep his connection with Max.  I was infatuated with Max,

2  I wanted to give him attention, care, I wanted to please him.

3          Ryan reported the relationship online with Max

4  persisted over a couple of years.  Ryan noted that at one point,

5  Max asked him to hold some digital files for him, they were

6  files of child pornography, he reported, he complied.

7          This was in a report, a pretty lengthy and very

8  thorough report, that the hired and compensated expert witness

9  prepared, you would think, after a lot of thought and based on

10  his conversations with Mr. Davis.

11          All of that says one thing, Mr. Davis told Dr.

12  Haworth, Max made me do it, so I did it, because I didn't want

13  to lose him.  That's not credible on its face for all of the

14  other reasons I've talked about, but what then made it laughable

15  was how Dr. Haworth sat right up here under oath and said:

16          Well, let me just be -- be sure you know, he never

17      presented it in a devil made me do it.

18          That's what that is, that's two pages of the devil

19  made me do it.  I can't give that expert opinion much weight on

20  anything, that affects the credibility of everything Dr. Haworth

21  said.

22          (Pause at 5:41 p.m.)

23          THE COURT:  Dr. Haworth's report said that:

24          Ryan showed no sexual interest in any category of

25      prepubescent child across genders.

1      That statement doesn't even apply to the facts of this

2  case, it could be from another case he had, I don't know, it

3  doesn't apply here, it's false.

4      Dr. Haworth then, naturally, found that that was well

5  within normative limits.  Dr. Haworth said that:

6      The pattern of offending behavior, is not necessarily

7      the result of specific deviant arousal towards

8      prepubescent children.

9      Dr. Haworth actually wrote the following in his

10  report:

11      Ryan's drive to be wanted by Max and secure his

12      adulation and interest in him, overwhelmed his immature

13      judgment and capabilities, creating the path to his

14      offending.  Once hooked, Ryan became desensitized to

15      sexual contact with children.

16      Dr. Haworth's findings are all based -- whether you'd

17  want to believe Max is a real person or not and I don't -- but

18  even if he was, they're all based on Ryan telling him this and

19  him just spitting back out onto a piece of paper.

20      And then, he gets on the stand and says:

21      I was -- Ryan never said, the devil made me do it.

22      Does that sound like that to you?  That was his

23  report.

24      The minimization of what the defendant did to his

25      cousins, the contact offenses --

1           That was Dr. Haworth's shorthand for what he did to

2    his cousins.

3           -- were limited to his two small male cousins, whom he

4    had access to through babysitting and were limited in duration.

5    There is no evidence, he ever repeated such behavior with other

6    children.

7           Well, that's good.  That's horrible.  The fact that he

8    only did it a couple of times with his two small cousins,

9    because he got caught, that's what I'm asked to believe should

10   constitute the minimization of the conduct.

11          Yet a page or two later, Dr. Haworth says:

12          Ryan has remorse for his actions and has shown no

13      extreme minimization of the offense.

14          That's not true -- that's not true based on anything I

15   saw, read or heard around here.

16          His deviant behavior appears to be more situational

17      than having taken hold with him.

18          Dr. Zakireh, too, relies on everything Mr. Davis told

19   him about Max or Mike or Matt.  He, too, didn't seek to verify

20   the reality of any of that.  He, too, cites to Max for inducing

21   Mr. Davis to molest his young cousins.

22          Both of the experts conclude that he has a low to

23   moderate risk of recidivism.  It didn't -- Ms. Rotella pointed

24   out the mistakes Dr. Haworth made on a very material aspect of

25   his report, by the way, the total score which then plays into a

1   prognostication about recidivism.

2        People make mistakes, I don't hold his mistake against

3   him, although he made, actually, multiple mistakes on the same

4   one number he was calculating and it was whether, it was a

5   three, a four or a five, not whether it was eight -- eight

6   million, six hundred and eighty-three versus some other high

7   number, okay.  He made a mistake, people do, judges, too.

8        But what grabs you is, even as he bumps the score up,

9   he never alters the risk assessment.  He can fiddle with the

10  numbers, but he can't fiddle with the conclusion, he explained

11  to me, why.  I gave his testimony very little weight on that.

12  He was looking for a way to get to a desired end point.

13       Dr. Zakireh talked about how Mr. Davis has:

14       Manifested a relatively high level of responsibility

15     for his behavior.

16       There is nothing in this record which supports that

17  statement, nothing.

18       (Long pause at 5:48 p.m.)

19       THE COURT:  To conclude with respect to the need to

20  protect the public, I -- I do come back to Dr. Rodriguez:

21       Overall, the defendant's risk of sexual violence

22     and recidivism for similar acts which led to his current

23     arrest is considered moderate to high at this time with

24     the recommendation that he'd be designated to a sex-

25     offender management program with a mixed prognosis --

1      mixed.  And dysfunction features which would likely

2      prove resistant to significant change.

3           Dr. Rodriguez is concerned based on everything she saw

4      and her evaluation about the risk to the public that the

5      defendant would present.  So, the need to protect the public

6      from further crimes he might commit is -- it is very high here,

7      it's very high.

8           I am required to consider the need to provide the

9      defendant with needed educational or vocational training,

10     medical care or other correctional treatment in the most

11     effective manner.  There is no need to adjust his sentence for

12     any of that, the treatments he receives, particularly, when

13     designated by the BOP appropriately, should be provided over a

14     lengthy period of incarceration and supervised release.

15          The -- Mr. Davis has no health concerns, no addiction

16     concerns, which call to the -- to the Court's attention any need

17     to adjust the sentence.

18          I am required to consider whether the kinds of

19     sentences available could result in an unwarranted disparity.

20     The law wants us to make sure that we sentence a person,

21     appropriately, that the sentence that a person receives in my

22     courtroom or a sentence that a person receives in New Jersey for

23     the same conduct isn't wildly out of whack.  So, we are asked to

24     be sure that that's not the case.

25          This sentence is within the advisory guideline range

1   for defendants, who commit these crimes, many of whom, by the

2   way, are first-time offenders with no history of actually

3   sexually abusing children, unlike, Mr. Davis.

4           So, I -- I see nothing to suggest that on the facts of

5   this case, a guideline sentence gives rise to any concerns about

6   unwarranted sentencing disparities.

7           (Pause at 5:51 p.m.)

8           THE COURT:  I thought it was also very important that

9   Mr. Davis told both of his hired expert witnesses, that most of

10  the material he'd downloaded was adult pornography, that was a

11  very easily, objectively verifiable statement, that neither

12  doctor even looked into and as we know, it was a lie.

13          If he's lying to his own expert witnesses to help

14  develop an argument for mitigation of a potential sentence, it

15  just doesn't bode well for how he's going to do, separate and

16  apart from the experts not even -- not even -- looking into it,

17  it was easy, that was very easy to determine, yet Dr. Zakireh

18  says:

19          Flat out, lies are not predictive at all about

20  recidivism.

21          Imagine that, flat out lies are not predictive at all

22  about recidivism.  Well then, why do we even interview anybody?

23  Of course, they're predictive about recidivism, the statement is

24  ridiculous on its face.

25          (Pause at 5:53 p.m.)

1       THE COURT:  I asked Dr. Hawthorne (sic) a pretty

2  basic, pretty -- a pretty easy question, I was stunned, Ms.

3  Rotella didn't beat me to it.

4           If it turns out, Max never existed, Doctor, would

5           that in any way alter your report or your opinion in --

6           such as in assessing the defendant's acceptance of

7           responsibility and thus, prospects for rehabilitation or

8           recidivism?

9           No, he says, if it turns out that the entire reason

10          that Mr. Davis gave him for engaging in this horrific

11          conduct was a lie, it wouldn't affect his conclusion

12          about his acceptance of responsibility.

13          That alone just about disqualifies Dr. Zakireh (sic)

14  from being taken seriously.

15          As do the extent to which both experts went to avoid

16  acknowledging that Mr. Davis is a pedophile.  They certainly had

17  all of the indicators, they just weren't going to say it,

18  because they couldn't.

19          But when you hear Dr. Rodriguez explain the diagnosis,

20  of -- of course, it's consistent with everything we know about

21  the case.

22          (Pause continues at 5:56 p.m.)

23          THE COURT:  Pardon me, while I just review my notes to

24  make sure, I am addressing the points that Counsel made.

25          (Long pause continues at 5:59 p.m.)

1       THE COURT:  I want to thank, again, everyone for

2   sending me their letters, I did read them and I took them to

3   heart, they were overwhelmed by the other evidence in the case,

4   but they were relevant to me.

5       I want to -- I want to, again, apologize to Ryan's

6   mother and his family and his friends and Mr. Justino for having

7   to hear that and having to hear everything that you've heard

8   today.  I am required to explain why I feel the sentence I

9   announced is appropriate.

10      And I can't pull any punches when I'd do that, so that

11  a reviewing court can see, exactly, why I did what I did and I

12  apologize for having to get into that.  And I know that this has

13  been a very painful day and very long day.  And I -- I pray for

14  peace for all of you, I truly do.

15      Before I impose the sentence that I've outlined to the

16  lawyers, do either of you have any objections to any substantive

17  or procedural matters, are there any errors that you think I

18  made in articulating my sentence, is there anything you think, I

19  did not discuss?

20      MS. ROTELLA:  No -- no, your Honor.

21      When the sentence is concluded, I would just ask that

22  the -- that the Court incorporate the forfeiture of the two

23  items that were seized from him as part of the --

24      THE COURT:  At the close of business, we'll handle the

25  motion to dismiss Count 2 and the --

1          MS. ROTELLA:  Okay.

2          THE COURT:  -- forfeiture motion.

3          MS. ROTELLA:  Thank you, that's all.

4          THE COURT:  Mr. Patrizio?

5          MR. PATRIZIO:  Judge, I -- I would -- I would like to

6    tell you, first of all, if I incurred wrath, I apologize, that's

7    number one.

8          What I was attempting to try to do, ah, and again, I'm

9    not attempting to incur your wrath, when I stated to you, that I

10   didn't know that Max would be such an issue, I did not think it

11   was something germane to the issue.

12         What I wanted to try to present, ah, as a result of it

13   becoming a centerpiece to a large extent of the testimony here

14   today, was that the initial offense, my client although there

15   is not a documented record, actually, went to the police

16   barracks --

17         THE COURT:  I accept your apology.

18         MR. PATRIZIO:  -- thank you, sir.

19         THE COURT:  Are you sure, you'd want to revisit this

20   now?

21         MR. PATRIZIO:  Ah, I -- I just wanted to -- I would --

22   I just wanted to --

23         (Discussion held off the record at 6:02 p.m.)

24         MR. PATRIZIO:  My client wants to respect your

25   decision for now and wants me to not elaborate --

1          THE COURT:  Okay.

2          MR. PATRIZIO:  -- I feel that's important.

3          THE COURT:  Thank you.

4          Then, if you and your client could please come

5     forward, we can impose the sentence.

6          MR. PATRIZIO:  Yes.

7          (Pause at 6:03 p.m.)

8          THE COURT:  Pursuant to the Sentencing Reform Act of

9     1984, it is the judgment of the Court, that the defendant, Ryan

10    Andrew Davis is hereby committed to the custody of the Bureau of

11    Prisons to be imprisoned for a term of 240 months on each of

12    Counts 1 and 3 to be served concurrently.

13         Upon release from imprisonment, the defendant shall be

14    placed on supervised release for a term of life on each of

15    Counts 1 and 3, such terms to be served concurrently.

16         Within seventy-two hours of release from the custody

17    of the Bureau of Prisons, the defendant shall report in person

18    to the Probation office in the district to which the defendant

19    is released.

20         While on supervised release, the defendant shall not

21    commit another federal, state or local crime.  Shall be

22    prohibited from possessing a firearm or other dangerous device.

23    Shall not possess an illegal controlled substance and shall

24    comply with the other standard conditions that have been adopted

25    by this Court.

1          Based on the information presented, the defendant is

2    excused from the mandatory drug-testing provision, however, he

3    may be requested to submit to drug testing during the period of

4    supervision, if the Probation officer determines a risk of

5    substance abuse.

6          The defendant shall permit -- shall submit -- to the

7    collection of a DNA sample from the defendant at the direction

8    of the Probation office pursuant to Section 3 of the DNA

9    Analysis Backlog Elimination Act of 2000.

10          The defendant shall also comply with the following

11   special conditions:

12          He shall participate in a sex-offender program for

13   evaluation and treatment and abide by the rules of any such

14   program until satisfactorily discharged.  While in the treatment

15   program, the defendant shall submit to risk assessment,

16   psychological testing and physiological testing, which may

17   include but not be limited to, polygraph or other specific tests

18   to monitor compliance with supervised release and treatment

19   conditions.

20          The defendant shall report to the Probation office any

21   regular contact with children of either sex under the age of

22   eighteen.

23          The defendant shall not obtain employment or perform

24   volunteer work, which includes regular contact with children

25   under the age of eighteen.

1     The defendant shall comply with the requirements of

2  the Sex Offender Registration and Notification Act as directed

3  by the Probation officer, the Bureau of Prisons or any state sex

4  offender registration agency in which he resides or is a student

5  or was convicted of a qualifying offense.

6     The defendant shall submit to an initial inspection by

7  the Probation office and to any examinations during supervision

8  of the defendant's computer and any devices, programs or

9  applications.

10     The defendant shall allow the installation of any

11  hardware or software systems which monitor or filter computer

12  use.  He shall abide by the standard conditions of computer

13  monitoring and filtering that have been approved by this Court.

14     The defendant is to pay the cost of the computer

15  monitoring, not to exceed the monthly contractual rate in

16  accordance with the Probation office's discretion.

17     The defendant shall participate in a mental-health

18  program at the direction and discretion of the Probation office

19  and abide by the rules of any such program until satisfactorily

20  discharged.

21     The defendant shall provide the Probation office with

22  a full disclosure of his financial records to include yearly

23  income-tax returns upon the request of the Probation office.  He

24  shall cooperate with the Probation officer in the investigation

25  of his financial dealings and shall provide truthful monthly

1    statements of his income.

2          The -- the defendant is prohibited from incurring any

3    new credit charges or opening additional lines of credit without

4    the approval the Probation officer, unless the defendant is in

5    compliance with a payment schedule for any special assessment or

6    restitution obligation.

7          The defendant shall not encumber or liquidate interest

8    in any assets, unless it is in direct service of the special

9    assessment or restitution obligation or otherwise has the

10   expressed approval of the Court.

11         Pursuant to 18 United States Code, Section 2259, the

12   defendant shall pay the agreed-upon amount between counsel for

13   the defendant and the Government, $15,000.00 in restitution.

14   The Court will waive the interest requirement in this case.

15         Do we need to have anything specific in the J&C about

16   where that restitution is directed?

17         MS. ROTELLA:  Yes, sir.

18         I believe, I filed under Exhibit I, my supplemental

19   memorandum, it was a chart, it includes who this amount should

20   be made payable to --

21         THE COURT:  All right.

22         MS. ROTELLA:  -- so, I'll just incorporate that.

23         THE COURT:  We will do that and we'll put that in the

24   J&C, thank you.

25         MS. ROTELLA:  Thank you.

1          THE COURT:  Yes.

2          And, obviously, anything that's required to go on the

3    docket to the extent that they have information on the -- those

4    folks, will be sealed.  Okay.

5          MS. ROTELLA:  They're pseudo names, so, I think, we're

6    okay.

7          THE COURT:  Okay.

8          I find the defendant does not have the ability to pay

9    a fine, I will waive the fine in this case.  I also find the

10   defendant is indigent and does not have the ability to pay an

11   assessment for the Justice for Victims of Trafficking Act of

12   2015.  The defendant shall, however, pay to the United States, a

13   total special assessment of $200.00.  The restitution and

14   special assessment are due immediately.

15         It is recommended that the defendant participate in

16   the Bureau of Prisons' Inmate Financial Responsibility program

17   and provide a minimum payment of $25.00 per quarter toward the

18   amount due.  In the event the entire amounts due are not paid

19   prior to the commence of supervision, the defendant shall

20   satisfy the amounts due in monthly installments of not less than

21   $50.00 to commence thirty days after release from confinement.

22         The defendant shall notify the United States Attorney

23   for this district within thirty days of any change of mailing

24   address or residence that occurs while any portions of the

25   special assessment and restitution remain unpaid.

1          Mr. Davis, I've reviewed your guilty-plea agreement

2     and I know that you waived your right to appeal your sentence in

3     that guilty-plea agreement.  You may appeal your sentence

4     consistent with that agreement, if you qualify under one of the

5     following four exceptions:

6          First, if the Government appeals your sentence, you

7     may appeal.

8          If your sentence would have exceeded the statutory

9     maximum penalty, you could appeal.

10          If the sentence imposed had departed upward pursuant

11     to the guidelines, you could appeal.

12          Or if the sentence imposed was a sentence above the

13     sentencing guideline range, you would have the right to appeal.

14          Additionally, when you pled guilty, you greatly

15     limited your right to collateral attack and *habeas corpus*,

16     except that you may file a petition under Section 2255 to raise

17     a claim of constitutionally-ineffective assistance of counsel.

18          For an appeal to be effective, you must file a Notice

19     of Appeal with the Clerk of Court no later than fourteen days

20     from the date the judgment is entered.  Failure to file a Notice

21     of Appeal will result in your losing your right to appeal the

22     Court's sentence to the Court of Appeals.

23          You are also advised that you have a right to be

24     represented by counsel on an appeal and if you are financially

25     unable to hire private counsel, you may submit a financial

1    affidavit and if you qualify, the Court will appoint counsel to

2    handle your appeal.

3            Ms. Rotella, would you now like to move to dismiss

4    Count 2 of the indictment?

5            MS. ROTELLA:  Yes, sir, I would.

6            And also -- I'm sorry, if I missed it -- but did you

7    incorporate the forfeiture?

8            THE COURT:  I will now, we can -- we have the motion

9    for a final order of forfeiture, I assume, no objection thereto,

10   that was in the guilty-plea agreement as well.

11           MR. PATRIZIO:  No objection.

12           THE COURT:  All right.

13           We will enter the order on the motion for -- for a

14   forfeiture.

15           MS. ROTELLA:  Thank you, your Honor.

16           THE COURT:  And we'll dismiss Count 2 of the

17   indictment.

18           MS. ROTELLA:  Thank you.

19           THE COURT:  Are there any further matters anyone needs

20   to take up before we adjourned?

21           MR. PATRIZIO:  Your Honor, would you recommend FCC

22   Devens?

23           THE COURT:  That's -- thank you for reminding me of

24   that.

25           I know, obviously, that the BOP will do an assessment

1    and Ms. Rotella, you may be able to help me with this, but is

2    there any special recommendation I'd need to make for a

3    designation, be it, either, consistent with Dr. -- with what Dr.

4    Rodriguez thought appropriate or to make sure that he's in the

5    right place?

6              MS. ROTELLA:  Sir, I -- I would say this, that I

7    think, it would help if the Court were to request from the

8    Bureau of Prisons, that he'd be designated to -- to take part

9    that Sex Offenders Management Program --

10             THE COURT:  Yes.

11             MS. ROTELLA:  -- the SOMP Program.

12             THE COURT:  Yes.

13             MS. ROTELLA:  I am not certain it's, you know, they

14   may choose -- that's operated in a number of different

15   facilities, so --

16             THE COURT:  Okay.

17             MS. ROTELLA:  -- that's really what the goal is

18   here --

19             THE COURT:  Okay.

20             MS. ROTELLA:  -- to make sure that he gets treatment.

21   And he can also say that if he's designated to that kind of

22   program closest to where he lives, so that means --

23             THE COURT:  Which I think, the First Step Act will

24   take care of, anyway, right?

25             MS. ROTELLA:  Yes, yes.

1              THE COURT:  Yes, all right.

2              MS. ROTELLA:  But I -- I think that would be helpful.

3              THE COURT:  I -- I -- so, we'll make the

4    recommendation that he's designated to a place that has the Sex

5    Offender Management Program, SOMP, as Dr. Rodriguez -- and I

6    think, she testified that it's available at Devens and, at

7    least, one other place.

8              So, I'll make that recommendation and then the BOP

9    will make the appropriate assessment.

10             MR. PATRIZIO:  Thank you.

11             THE COURT:  Thank you for reminding me of that.

12             Is there anything else?

13             MS. ROTELLA:  No, your Honor, thank you.

14             MR. PATRIZIO:  Thank you.

15             THE COURT:  We're adjourned.

16             DEPUTY CLERK:  All rise.

17             (Adjourned in this matter at 6:13 p.m.)

18                                    *  *  *

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I, a court-appointed transcriber, certify
that the foregoing is a correct transcript from the
electronic-sound recording of the proceeding in the above-
entitled matter.

Date: <u>June 8, 2021</u>

Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270